UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

ELYSIUM HEALTH, INC.,                          :

                  Plaintiff,               :

        - against -                          :          Civ. No. 17-_____

CHROMADEX, INC.,                               :

                Defendant.              :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## COMPLAINT

Plaintiff Elysium Health, Inc. ("Elysium") brings this action for false advertising, trade libel, deceptive business practices, and tortious interference with prospective economic relations against Defendant ChromaDex, Inc. ("ChromaDex"). Elysium makes the following allegations upon personal knowledge as to its own acts, and upon information and belief as to all other matters, and alleges as follows.

## OVERVIEW OF ACTION

1.      This is an action for false advertising, trade libel, deceptive business practices, and tortious interference with prospective economic relations arising from ChromaDex's abuse of the citizen petition process of the Food and Drug Administration ("FDA") and submission of a sham petition to sabotage its one-time contractual partner and current competitor, Elysium.

2.      Elysium sells a dietary supplement, Basis, that combines nicotinamide riboside (sometimes called "NR") and pterostilbene (sometimes called "PT").

3.      ChromaDex, which is the exclusive licensee of several NR-related patents and bills itself as the sole commercial supplier of NR in the world, originally supplied NR to Elysium, which was by a wide margin ChromaDex's largest customer, but the demise of the parties' contractual relationship—occasioned by ChromaDex's breaches of contract and attempts

to conceal those breaches—spurred ChromaDex's own move into the NR consumer product market, in competition with Elysium.

4.      ChromaDex's need to transition its business model in this way became acute after Elysium filed petitions for *inter partes* review of two of the NR-related patents licensed by ChromaDex. These petitions show that the claims underlying the two patents are anticipated by prior art and request that those claims be canceled.

5.      Its patents at risk and its relationship with its largest customer in shambles, ChromaDex sought to undermine Elysium to pave the way for its own competing nicotinamide riboside product.

6.      To that end, on August 18, 2017, ChromaDex submitted a citizen petition to FDA, which, pursuant to FDA practice, was made public, requesting that the agency immediately require Elysium to cease distributing Basis and take "other appropriate enforcement action," including seizing Elysium's product and enjoining the manufacture and distribution of Basis. These actions were justified, ChromaDex contended, because Basis was "contaminated" and "injurious to health," based on in-house testing it had conducted that purportedly revealed the presence of toluene, a "toxic industrial solvent."

7.      Requests for FDA to initiate enforcement actions are not within the scope of FDA's citizen petition procedures. *See* 21 CFR § 10.30(k). Thus, the citizen petition is not an appropriate vehicle for asking FDA to take enforcement action against a company. Despite this fact, ChromaDex nevertheless filed this petition because it was a public vehicle for injuring Elysium's reputation with current and potential customers, supply chain partners, advisors, and investors and thereby damaging Elysium's standing in the marketplace.

8.     Along with falsely characterizing Basis as "injurious to health," ChromaDex misleadingly stated in its petition that FDA has not set standards allowing for the inclusion of toluene in a dietary supplement, omitting that FDA has adopted certain standards from the International Conference on Harmonisation ("ICH") for pharmaceuticals and regularly accepts submissions from dietary supplement manufacturers that apply those standards to nutritional supplements, and that the tiny amounts of toluene ChromaDex alleged to be included in Basis were well below the ICH limits for toluene.

9.     By intentionally omitting that fact, and misleadingly stating that FDA had "not set any allowed level of exposure to toluene in a dietary supplement," ChromaDex knowingly created the false impression that the small amounts of toluene it claimed to have found in Basis did not conform to any safety standard accepted by FDA.  In fact, ChromaDex knew that this statement was false, because it knew that FDA had adopted the ICH guidelines and knew that the small amounts of toluene it alleged to have found in Basis were well below the acceptable levels for toluene that have been set by the ICH and adopted by FDA.

10.     In its petition, ChromaDex advised FDA that it sold pterostilbene (under its brand name, "pTeroPure") to Elysium.  What ChromaDex neglected to tell FDA, however, is that the pterostilbene it sold Elysium, and that it knew Elysium used to make Basis, contained toluene. Nor did ChromaDex disclose in its petition that it has itself sold directly to consumers products containing the same proprietary pterostilbene.

11.     When ChromaDex sold Elysium its toluene-containing pterostilbene, it referenced the ICH guidelines as evidence that its product was safe.  ChromaDex omitted this material fact from its petition. Further, although it was aware of these standards at the time it submitted its petition, ChromaDex did not disclose the existence of these standards, nor did it disclose that the

small amounts of toluene that Basis purportedly contained fell far below the acceptable amounts of toluene in the ICH guidelines. In omitting this material information from its petition, ChromaDex knowingly and falsely portrayed Basis as dangerous.

12. So that it could promote its own competing product in comparison with the allegedly dangerous Basis, ChromaDex also included in its petition a number of gratuitous statements about the safety and regulatory status of its own product, touting its superior quality, which were likewise false and misleading.

13. To leverage these falsehoods and use them to injure Elysium while driving sales of its own competing product, ChromaDex expended significant effort to publicize the false statements in its petition, including by bringing the issue to the attention of an editor at a popular trade journal and prompting publication of an article repeating the petition's falsehoods, disseminating the petition and articles commenting on it to the public, and harassing Elysium's slate of scientific advisors with unwelcome messages regarding the alleged contamination of Basis. ChromaDex simultaneously increased advertising of its own product.

14. As a result of ChromaDex's campaign of misinformation and self-promotion, Elysium has sustained, and continues to sustain, damages, including the loss of actual and potential customers, harm to its reputation, and the loss of potential business relationships and injury to existing business relationships.

15. Through this Complaint, Elysium seeks to recover for the damages, the full amount of which is yet unknown, that it has sustained as a result of ChromaDex's misconduct.

## THE PARTIES

16. Plaintiff Elysium is a Delaware corporation with its principal place of business in New York. Elysium manufactures and sells the dietary supplement Basis, which combines

4

nicotinamide riboside, pterostilbene and other ingredients, to customers nationwide, and a significant portion of its customer base is located in New York.

17.     Defendant ChromaDex is a California corporation with its principal place of business in California.  It has at least one employee, Director of Investor Relations Andrew L. Johnson, located in New York.  ChromaDex distributes, among other things, nicotinamide riboside and pterostilbene and a direct-to-consumer nicotinamide riboside product to customers, including customers in New York.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331  and 28 U.S.C. § 1121 because this is a civil action arising under 15 U.S.C. § 1125 and pursuant to 28 U.S.C. § 1332 in that it is an action between citizens of different states and the matter in controversy exceeds the sum or value of $75,000 exclusive of interest and costs.

19.     This Court has personal jurisdiction over ChromaDex because ChromaDex purposefully availed itself of the privilege of transacting business within the state of New York, including by marketing and supplying its direct-to-consumer nicotinamide riboside product to customers in the state of New York, and the claims asserted herein arise out of and/or relate to ChromaDex's transaction of business within the state of New York; because ChromaDex committed tortious acts within the state of New York and the claims asserted herein arise out of and/or relate to those acts; and because ChromaDex committed tortious acts causing injury to Elysium within New York, and the claims asserted herein arise out of and/or relate to those acts, ChromaDex should have reasonably expected the acts to have consequences within New York in light of Elysium's presence within New York and the presence of its customers in New York, and ChromaDex derives substantial revenue from interstate commerce, including revenue from

transactions with customers located in, among other locations, New York, Maryland, Idaho, and Florida.

20.     Venue is proper in this District pursuant to 28 U.S.C. § 1391.

## FACTUAL ALLEGATIONS

### ChromaDex Turns On Its One-Time Largest Customer and Contractual Partner

21.     Nicotinamide riboside is a pyridine nucleoside form of Vitamin $B_3$ that functions as an efficient precursor to oxidized nicotinamide adenine dinucleotide ("NAD+").  NAD+ is a coenzyme found in all living cells that plays an essential role in hundreds of metabolic processes.

22.     ChromaDex is the exclusive licensee to a number of NR-related patents.  It bills its nicotinamide riboside product as "the world's first and only commercially available nicotinamide riboside."  In reference to ChromaDex's control over the worldwide supply of NR, ChromaDex CEO Frank Jaksch has regularly stated, "I am NR."

23.     The parties executed an agreement for the supply of nicotinamide riboside (the "NR Supply Agreement") and a trademark and royalty agreement (the "License and Royalty Agreement") on February 3, 2014, and an agreement for the supply of pterostilbene (the "pTeroPure Supply Agreement"), another ingredient in ChromaDex's inventory, in June 2014.

24.     ChromaDex's breaches of those agreements, and attempts to conceal the breaches, culminated in the institution of litigation in the U.S. District Court for the Central District of California in December 2016.

25.     While Elysium had sought over several months to work in good faith with ChromaDex to restore the parties' relationship and allow ChromaDex to remediate its breaches by awarding Elysium the credit or refund to which it was entitled for ChromaDex's violations of the NR Supply Agreement, ChromaDex refused to provide Elysium with the information required to calculate the amount of the credit or refund, and its management eventually refused

6

to engage in further discussions with Elysium. Instead, ChromaDex tasked Michael Brauser, one of its former directors, with harassing Elysium in a series of increasingly antagonistic telephone calls, which were directed to Elysium's Chief Operating Officer and main office, both located in New York.

26. Brauser, a major shareholder who had abruptly resigned from ChromaDex's board alongside his longtime crony Barry Honig shortly after Honig was identified as a key participant in fraudulent stock promotion practices in an SEC settlement agreement and criminal plea agreement entered into by the CEO of a company in which Honig had been a major investor, has, along with Honig, been connected to a number of failed companies and accusations of questionable stock promotion practices and self-dealing. These include:

- A class action lawsuit that named as defendants a third major ChromaDex investor and also former movie producer and newly-appointed ChromaDex President and Chief Strategy Officer Robert Fried, brought by the shareholders of Ideation Acquisition Corp. ("Ideation"), a special purpose acquisition vehicle for which the investor served as chairman and Fried as president. The investor, Fried, and the company's other directors and executives were accused of distributing fraudulent financials in order to obtain shareholder approval of an acquisition that flopped; the company's insiders, the suit alleged, had issued themselves millions of shares and stock purchase warrants prior to its IPO and had had to carry out an acquisition within twenty-four months or return the company's capital. Honig and Brauser had several other connections to the company: Honig and Brauser allegedly served as directors of a company acquired by Ideation's successor company, Brauser's son served as an Ideation director before being replaced by the major ChromaDex investor, and Brauser was paid hundreds of thousands of dollars by the Ideation successor entity in connection with related party transactions.

- A whistleblower complaint against Brauser, Honig, and ChromaDex's third major investor accusing the trio of planning to inflate the stock price of Biozone Pharmaceuticals, a company in which all three were investors, by filing false statements with the SEC, among other practices.

- An investigation by the Securities Exchange Commission of MGT Capital Investments, a shell company in which Honig was a major investor.

- A plea agreement by the CEO of stock promotion vehicle YesDTC, who pled guilty to fraud, implicating Honig in fraudulent "pump and dump" stock promotion schemes for the company.

27.     ChromaDex's campaign of harassment did not end with the commencement of litigation, however, but continues to this day.  Since its misconduct disrupted its relationship with Elysium, ChromaDex had been forced, in earnings call after earnings call, to defend its disappointing financial performance resulting from the loss of Elysium, formerly its largest customer.  Beyond these slumping sales, though, ChromaDex's future was more fundamentally threatened when, on July 17, 2017, Elysium filed petitions for *inter partes* review of two of the NR-related patents to which ChromaDex holds a license.  These petitions show that the claims of both patents are anticipated by prior art.

28.     ChromaDex has long relied on its patents to maintain its stranglehold on the nicotinamide riboside supply market.  By challenging them, Elysium indirectly paved the way for the entrance of other potential suppliers of nicotinamide riboside and destabilization of ChromaDex's entire supply business.

29.     In the face of this existential threat, ChromaDex scrambled to find other ways to curb Elysium and to resurrect its fading business.  Both goals, ChromaDex concluded, could be accomplished through destroying Elysium's business and seeking to usurp its dominant role in the NR consumer market.

### ChromaDex Seeks to Sabotage Elysium's Business
### As It Begins Marketing Its Own Competing Product

30.     The misrepresentations, fraud, and contractual breach that characterized ChromaDex's conduct in the course of the parties' contractual relationship and its aftermath are not the sole means whereby ChromaDex has sought to injure Elysium.  Rather, ChromaDex has continued its campaign of seeking to harm Elysium through the present and indeed ramped up its efforts as it has transitioned to competing with Elysium in the NR consumer market.

31. ChromaDex's motivation and a source of its bad faith became evident in early 2017, when ChromaDex announced that it had acquired Healthspan Research, LLC, a nutritional supplement company owned by ChromaDex's board member and future president, Rob Fried, and scientific advisory board member Charles Brenner, which marketed one product: TruNiagen, a "standalone nicotinamide riboside NIAGEN supplement"—a competing product, in short, to Elysium's Basis, but one that was far less successful.

32. That ChromaDex intended to enter into the market as a direct-to-consumer retailer, rather than remain a supplier to retailers like Elysium, was made clear by ChromaDex CEO Frank Jaksch, who explained in the company's August 10, 2017 earnings call that ChromaDex was engaged in a conversion "from an ingredient supplier to consumer product company" and would deliver its "blockbuster ingredient in the anti-aging market" directly to consumers.

33. ChromaDex's decision to throw its weight behind TruNiagen has manifested in an expanded nationwide marketing campaign and the promotion of a new interactive website at app.truniagen.com for sales of TruNiagen direct to consumers. The website directs visitors to establish a user account and to "buy now" through direction to an order form for entry of their personal, shipping, and payment information in order to purchase TruNiagen, either as a one-time order or an ongoing subscription. Through its website, ChromaDex has knowingly entered into transactions for the sale of TruNiagen to New York residents and has otherwise targeted New York through, among other actions, advertising and presenting at multiple industry conferences in New York.

34. Determined to wrest control of the market for NR products away from its current and former customers and most especially Elysium, which had garnered a dominant share of the

NR consumer market, ChromaDex soon rolled out a multi-faceted campaign of misrepresentation, innuendo, and abuse of process directed to tarnishing Elysium's and Basis's reputations and injuring Elysium's business in order to capture its customers.

35.     On August 18, 2017, ChromaDex submitted a citizen petition (the "Sham Petition") to FDA claiming that Elysium's Basis was "contaminated" and requesting that FDA require Elysium to cease distribution of Basis, initiate a seizure action against the Basis product, and enjoin further manufacture or distribution of Basis.

36.     In the Sham Petition, ChromaDex made statements regarding (i) the alleged "contamination" of Basis; (ii) the regulatory status of the NR within Basis; and (iii) the safety and regulatory status of its own nicotinamide riboside product.  ChromaDex's statements regarding each subject were false and misleading, and ChromaDex did not expect that they would result in the action requested but instead included them only to convince consumers not to trust Elysium and to reject Basis, and to promote its own competing product.

37.     That ChromaDex intended only to harm Elysium through the Sham Petition, rather than bring to the attention of FDA a genuine concern, is evident from its improper reliance on the citizen petition process.

38.     ChromaDex requests in the Sham Petition that FDA find Elysium's Basis to be adulterated so that it will "immediately require that Elysium cease distribution of its Basis product and take other appropriate enforcement action, including seizure of violating products and an injunction against the manufacturers and distributors."

39.     The applicable regulations establishing the FDA citizen petition process define the scope of relief available through a citizen petition by directing that each petition contain a request that the Commissioner of Food and Drugs "issue, amend, or revoke a regulation or order

or take or refrain from taking any other form of <u>administrative action</u>." 21 C.F.R. § 10.30(b) (emphasis added). Further, the regulation sets forth that "[t]his section does not apply to the referral of a matter to a United States attorney for the initiation of <u>court enforcement</u> action." 21 C.F.R. § 10.30(k) (emphasis added).

40. The remedies of seizure and injunction fall under the scope of "judicial actions," not "administrative actions," as established by the Food, Drug, and Cosmetic Act and as the publicly-available Regulatory Procedures Manual for FDA personnel makes clear, as well as the statutory authority directing the pursuit of seizure and injunction actions in U.S. federal courts, rather than administrative tribunals. *See* 21 U.S.C. § 334(a)(1); 21 U.S.C. § 332(a).

41. Consistent with that authority, FDA has repeatedly stated in publicly-posted denials of citizen petitions that it will <u>not</u> take enforcement action of the type requested by ChromaDex in the Sham Petition in response to a citizen petition, as requests for enforcement actions are outside the scope of the citizen petition procedures. Instead, FDA accepts confidential complaints from competitors, generally via letters colloquially referred to by FDA-regulated companies as "trade complaints," in connection with enforcement action.

42. As such, no reasonable petitioner would expect to obtain the relief that ChromaDex sought in the Sham Petition.

43. Nor did ChromaDex have any such expectation. Rather, ChromaDex, which offers regulatory consulting services to companies to assist them in "successful navigation of an ever-changing regulatory climate," including consulting services relating <u>specifically</u> to FDA petitions, knew full well the citizen petition process would not yield the relief it requested and that the "trade complaint" process would not provide it with the same opportunity to publicly disparage a competitor's product. It thus intentionally chose the wrong FDA process, one that

11

would not result in the relief it sought but that would give it the opportunity to publicly harm Elysium's and Basis's reputations.

44.     ChromaDex submitted the Sham Petition solely for the purpose of causing injury to Elysium for its own ends, which it accomplished by disseminating false and misleading statements regarding the safety of Elysium's Basis and its own competing product and by requesting enforcement action by FDA for a purported regulatory violation with no expectation of FDA actually taking that action in order to further the perception that Elysium's Basis was unsafe and of a lower quality than its competing product.

**ChromaDex Relies on Agents to Deceive Elysium
and Convince It to Provide Product Samples for Testing**

45.     In the Sham Petition, ChromaDex contended that it recently learned that Elysium was no longer using ChromaDex's nicotinamide riboside in Basis, and concerns about a supposedly "counterfeit product" had motivated it to obtain samples of Basis, both from the period when it believed Elysium was using NR provided by ChromaDex and from when it had allegedly switched to an alternative supplier, and to submit them for compositional testing. ChromaDex performed this testing in its own in-house facility, rather than an independent third-party laboratory.   The documentation attached to ChromaDex's petition included a report purportedly summarizing this testing (the "Compositional Report").

46.     Appended to the Compositional Report was a series of photos of the Basis product samples that ChromaDex had obtained "from various persons" who ordered Basis from Elysium and then sent the unopened packages of Basis for ChromaDex for analysis.   The photos of the samples, the subjects of which include the packaging for the original Basis orders and packaging as those samples were forwarded on to ChromaDex, reveal the identity of those individuals.

47. These individuals had all purchased a Basis subscription within the same span of eight days—June 23 through June 30, 2017. Only one of the four had a previous subscription, which had lapsed a year prior.

48. ChromaDex shareholders, many of whom congregate on a ChromaDex internet forum, had previously speculated that Elysium would deplete its inventory of ChromaDex-provided NR and pterostilbene sometime around July 2017 and that it would be forced to transition its supply chain after its inventory was deleted. Thus, commencing a subscription at the end of June 2017 would maximize the chances, according to this theory, that a customer would receive an order of Basis that used ChromaDex-provided ingredients and subsequently an order of Basis that used ingredients not provided by ChromaDex.

49. Two of the individuals have direct ties to ChromaDex of which Elysium is aware: Jack Grimaldi, a registered investment advisor at Grimaldi Investment Services, is himself invested or represents clients who have invested in ChromaDex and frequently engages in dialogue with ChromaDex management during investor calls, and John Lemak, the individual buyer who had previously held a subscription before starting anew at the end of June 2017, is a ChromaDex investor whom ChromaDex's CEO had brought to the attention of Elysium's management as a "big fan" in early 2015, prior to the demise of the parties' contractual relationship.

50. Elysium believes that this concerted action—the order for new subscriptions by all four individual buyers within the same week, and the forwarding by each of unopened packages to ChromaDex for analysis—was coordinated by and at the behest of ChromaDex.

51. The terms of use Elysium maintains at its website at elysiumhealth.com, through which each individual buyer placed his or her order, directs that the products sold via the website

are provided under the condition that they are "for personal use only." The orders placed on ChromaDex's behalf by each individual buyer, which were intended to obtain samples for testing by ChromaDex rather than to obtain product for personal use, were thus accomplished via misrepresentation of the buyers' intended use to Elysium, which processed the orders from its offices in New York.

### ChromaDex Falsely Declares Elysium's Basis to Be Dangerous—Omitting that Its Own Product Carried the Same "Danger"

52.     Supposedly based on the analysis of the samples described in the Compositional Report, ChromaDex in the Sham Petition falsely claimed that Basis was adulterated through a purported "contamination" with toluene, an organic solvent that is used in, among others, the manufacture of many pharmaceutical products, which it described as a "toxic industrial solvent" "used in such things as paint thinners, fingernail polish, lacquers, and adhesives." ChromaDex, which has sold products containing similar residual amounts of toluene, knew that these statements were false and misleading.

53.     In the Sham Petition, ChromaDex represented that its in-house analysis of the Basis samples it obtained had revealed the presence of toluene in amounts ranging from 96 to 144 milligrams/kilogram in the samples dating from after Elysium's alleged switch to a new supplier (the "August Samples").

54.     Immediately thereafter in the Sham Petition, ChromaDex misleading stated that "FDA has not set any allowed level of exposure to toluene through oral ingestion of a dietary supplement," carefully omitting that FDA has itself promulgated no standards for the allowable levels of solvents in dietary supplements but instead has regularly accepted the application of standards established by the ICH for pharmaceuticals to nutritional supplements.

55. Nor did ChromaDex note that the levels of toluene found in the August Samples were far below the allowable levels established by the ICH, which allow for a permitted daily exposure ("PDE") of up to 8.9 milligrams of toluene per day, or 890 parts per million on a concentration basis for a 10-gram serving size. The levels of toluene listed in the Compositional Report range from 98 to 144 milligrams/kilogram, equating to .060 to .088 milligrams of toluene based on the serving size of Basis—*i.e.*, the "dangerous" toluene levels purportedly found in the August Samples contained less than 1% of the PDE.

56. Similarly, ChromaDex declared in the Sham Petition that toluene was "not listed as a solvent permitted in food for human consumption," omitting that nutritional supplements like Basis are not subject to the FDA regulations referenced by ChromaDex, and proclaimed that Basis thus "contain[ed] a deleterious substance that renders it injurious to human health."

57. ChromaDex CEO Frank Jaksch certified that the Sham Petition contained "all information and views on which the petition relies, and . . . includes representative data and information known to ChromaDex that are unfavorable to the petition."

58. This certification was false. In addition to falsely characterizing Elysium's product as dangerous, the Sham Petition omitted relevant information regarding the ICH and FDA standards for toluene inclusion showing that the danger supposedly posed by the toluene found in the August Samples had been created by ChromaDex out of whole cloth, and that the toluene levels purportedly detected in the August Samples were considerably below those applicable regulatory standards.[1]

---

[1] That ChromaDex did not sincerely believe its statements regarding the "contamination" of Basis are evident from its disregard of results of the Compositional Report that indicate the existence of similar issues with its <u>own</u> product. For example, the Basis samples that ChromaDex suggest use NR provided by ChromaDex contain, according to the Compositional Report, trace amounts of acetonitrile that are missing from the August Samples. Acetonitrile is a compound used in nail polish remover and like toluene classified as a "Class 2" solvent, yet the Sham Petition is silent on this "danger."

59.     Through these false statements, which omitted material information with the effect of misleading the public regarding the safety of Elysium's Basis, ChromaDex laid the foundation for a smear campaign that it hoped would damage Elysium, undermine Basis's position within the market, and pave the way for its own competing product.

**ChromaDex Purposefully Omits Mention of**
**Its Long History of Selling Toluene-Containing Products**

60.     That ChromaDex was aware of the false and misleading nature of the Sham Petition is apparent from its <u>own</u> supply, to Elysium and to the public, of a product containing more than trace amounts of toluene and its reliance on the same ICH standards that it completely disregarded in filing the Sham Petition in representing its product as safe to its customers.

61.     ChromaDex sold to Elysium pursuant to the pTeroPure Supply Agreement and currently markets a proprietary pterostilbene product called "pTeroPure."

62.     In May 2011, ChromaDex prepared a report (the "GRAS Report") "establishing the safety of pTeroPure" and contending that pTeroPure merited Generally Recognized As Safe ("GRAS") status.  ChromaDex provided the GRAS Report to its pTeroPure customers, which included Elysium, in order to convince them of the safety and product quality of pTeroPure.

63.     Trumpeting its self-affirmed GRAS status, ChromaDex sold pTeroPure to Elysium and other resellers, and additionally marketed and sold directly to consumers an entire line of products containing pTeroPure under the brand "BluScience," which ChromaDex sold to another company that continues to offer products containing pTeroPure to this day.

64.     The pTeroPure that ChromaDex sold to Elysium contained levels of toluene similar to that purportedly found in the August Samples analyzed in the Compositional Report.

65.     In multiple certificates of analysis (the "COAs") that ChromaDex provided Elysium from 2013 through 2016 reflecting compositional testing of samples of its own

pTeroPure product, which it described as "food grade bulk material," ChromaDex set forth testing results revealing that the pTeroPure samples contained toluene at levels up to 93 parts per million, just under the 98 milligrams/kilogram found in one of the allegedly "contaminated" Basis samples.

66.      That ChromaDex itself sold and enabled third-party sales of a product containing toluene at levels virtually identical to those purportedly found in the August Samples shows that it knew and disregarded that its statements in the Sham Petition regarding the "danger" and "contamination" of Basis arising from the toluene found in the August Samples were false and misleading.

67.      Further, ChromaDex's own sales also establish that ChromaDex was aware of and relied upon FDA-adopted ICH guidelines for allowable amounts of toluene and other residual solvents and knowingly made an untrue statement to FDA by failing to reference the existence of these guidelines and instead only stating that FDA "had not set any allowed level of toluene through oral ingestion of a dietary supplement."  This omission had the effect of falsely suggesting that FDA had never sanctioned the presence of <u>any</u> toluene in a dietary supplement.

68.      The "internal specification" sheet that ChromaDex regularly distributed to customers and potential customers, including Elysium, relaying the product specifications for pTeroPure designates "ICH Guidelines" as the "specification" and "acceptance criteria" for "residual solvent" levels, meaning ChromaDex represented to customers that its pTeroPure product would meet ICH guidelines for residual solvent levels.  Toluene is one such residual solvent.

69.     In addition, a certificate of analysis that ChromaDex provided Elysium in 2014 for its nicotinamide riboside product likewise designated "ICH Guidelines" as the applicable specification for "residual solvents."

70.     The internal specification sheet lists pTeroPure as "food grade," and the certificate of analysis for the nicotinamide riboside product lists the product as "dietary supplement bulk material;" that ChromaDex relied on ICH standards for both types of product is evidence of its knowledge that ICH standards are appropriate for both food grade and dietary supplement grade products.

71.     Further, Exhibit A to the pTeroPure Supply Agreement, which describes the product specifications for the pTeroPure sold by ChromaDex to Elysium pursuant to that agreement, also specifies that "ICH Guidelines" provide the specification for "residual solvents."

72.     Consistent with Exhibit A to the pTeroPure Supply Agreement, each COA ChromaDex provided to Elysium noted that the "specification" or limit for toluene was at 890 parts per million—exactly the ICH standard for pharmaceutical products that is completely absent from the Sham Petition.

73.     ChromaDex's reliance on FDA-adopted ICH guidelines for acceptable toluene levels to establish the safety of the pTeroPure it sold Elysium renders all the more disingenuous its statement that FDA "had not set any allowed level of toluene through oral ingestion of a dietary supplement" and its implicit suggestion that <u>no</u> level of toluene was acceptable according to FDA.

74.     ChromaDex's statements regarding the "danger" of Basis and omissions of the relevant FDA-adopted ICH guidelines were knowingly false and misleading and intended to

defraud the public into believing that Basis was unsafe, thereby damaging Elysium and improving its own market position.

75.    Given ChromaDex's knowledge of the existing guidelines establishing acceptable levels of toluene and awareness that the levels of toluene purportedly found within Basis were well below those acceptable levels, ChromaDex had no expectation that FDA would initiate any action on such grounds and instead included these statements within the Sham Petition solely to harm Elysium.

**ChromaDex Misrepresents the Safety and Quality of
Its Own Product to Contrast It with the Supposedly Unsafe Basis**

76.    Next, ChromaDex complemented its misrepresentations about Elysium's Basis with misrepresentations regarding its own nicotinamide riboside product, which it had recently introduced to the same direct-to-consumer market in which Elysium participated under the brand name "TruNiagen," in an effort to promote its own product at Basis's expense.

77.    While the quality of its own nicotinamide riboside product has no direct connection to the purported "contamination" of Basis alleged by ChromaDex in the Sham Petition, ChromaDex nonetheless included gratuitous statements regarding the quality and safety of its competing product, including the statement that "ChromaDex is the **only** supplier of nicotinamide riboside chloride, called NIAGEN®, sold under a New Dietary Ingredient Notification filed with FDA and has been generally recognized as safe ('GRAS')" (emphasis in original).

78.    As with its statements regarding Basis, ChromaDex omitted material information regarding its claim of GRAS status, which omission had the effect of rendering its statement false and misleading.

79.     Specifically, though ChromaDex cited its product's GRAS status in an attempt to make its Niagen, now packaged and sold directly to consumers as "TruNiagen," look like the safe and superior alternative to Elysium's purportedly dangerous Basis, ChromaDex intentionally omitted mention of the fact that its entitlement to GRAS status depended on the submission, in turn, of misrepresentations to FDA, so that the fact of GRAS status did not in reality indicate that ChromaDex's Niagen or TruNiagen was actually safer or manufactured to higher standards.

80.     In contending to FDA that Niagen warranted GRAS status (through its "GRAS Proposal"), ChromaDex included the conclusions of a panel of experts that had purportedly evaluated the Niagen manufacturing process and concluded that the product was GRAS.  As part of this conclusion, the panel had determined that Niagen was produced in accordance with "current good manufacturing practices ('cGMP')."

81.     ChromaDex likewise represented to Elysium in the course of the parties' contractual relationship and included as a warranty in the NR Supply Agreement that its Niagen product was manufactured in accordance with cGMP.

82.     Elysium discovered in September 2016, however, that the facility in which ChromaDex's Niagen was produced did not meet cGMP standards and never had.

83.     ChromaDex thus not only misrepresented to Elysium that its Niagen met cGMP standards, in violation of the warranties included in the NR Supply Agreement, but also misrepresented this fact to FDA in submitting the GRAS Proposal.

84.     Because of the omission of this information, ChromaDex's statement in the Sham Petition that its Niagen was GRAS had the effect of misleading the public regarding the safety and product quality of Niagen as compared to Elysium's Basis and represents yet another

example of ChromaDex relying on the citizen petition process to disseminate falsehoods in pursuit of improper ends.

85.     In addition to making these affirmative misrepresentations regarding product quality and its product's attainment of regulatory standards, ChromaDex also omitted material information from the Sham Petition to further mislead the public regarding the safety and quality of its nicotinamide riboside product as compared to Elysium's Basis.

86.     Although the clear implication of ChromaDex's gratuitous statements throughout the Sham Petition regarding Niagen's regulatory status and safety is that ChromaDex's Niagen-containing NR product is superior to Basis and that consumers should prefer it, the Compositional Report itself sets forth testing results that belie this conclusion but are nowhere mentioned in the body of the Sham Petition, or are mentioned but stripped of context that would establish their import.

87.     These results include the observation that the August Samples are "white and homogenous in color," rather than tan to brown, indicating that the nicotinamide riboside in the August Samples is actually more refined and contains fewer impurities than the nicotinamide riboside provided by ChromaDex allegedly contained in the other samples.

88.     Similarly, ChromaDex relies on the absence of a nicotinamide riboside monoacetate peak to conclude that the August Samples did not contain nicotinamide riboside provided by ChromaDex but is silent on the fact that the "known minor compound" reflected by that testing and missing from the August Samples is in fact an impurity present in ChromaDex's nicotinamide riboside, and its absence from the August Samples again indicates that the nicotinamide riboside used in the August Samples is of a higher quality than ChromaDex's product.

89.     Nor does ChromaDex highlight that its compositional testing revealed that the amount of nicotinamide riboside in the August Samples was actually <u>greater</u> than the amount of nicotinamide riboside in the samples incorporating ChromaDex's nicotinamide riboside, with less decomposition into nicotinamide, another marker of the higher quality of the August Samples.

90.     ChromaDex's strategic silence on these points, as with its misrepresentations about Basis and its own product, were intended to deceive the public regarding the safety and quality of its and Elysium's competing products and promote its product at the expense of Elysium's.

**ChromaDex Disingenuously Requests Comprehensive
Enforcement Action for Elysium's Purported Failure to Comply with a
Regulation of which ChromaDex Itself Has Been in Violation for Years**

91.     ChromaDex further did not expect that FDA would take any action in response to its statements in the Sham Petition that Elysium had not filed an New Dietary Ingredient Notice ("NDIN") for its purported new nicotinamide riboside but instead included such statements solely to further the perception arising out of its fraudulent statements regarding toluene that Basis is dangerous and falls below the standards adopted by FDA.

92.     That ChromaDex did not sincerely expect its statements to result in the relief it requested but only included such statements to bolster its false and misleading statements regarding Basis is evident from its improper reliance on the citizen petition process, as described above, but also may be inferred from ChromaDex's own failure to file an NDIN covering its own nicotinamide riboside product and corresponding direct-to-consumer Niagen-containing product, "TruNiagen."

93.     Longstanding FDA draft guidance relating to NDINs makes clear that if a company is planning to market a product that exceeds the highest daily intake level or single-

serving dose for which safety information was submitted in a previous NDIN, that company must submit a new NDIN covering the higher daily intake level.

94.     The NDIN that ChromaDex filed for Niagen specifies a highest daily intake level of 180 milligrams per day.

95.     TruNiagen, the Niagen-containing product that ChromaDex sells directly to consumers, however, specifies an intake level of 250 milligrams per day.

96.     ChromaDex, which maintains a regulatory consulting business that specifically advertises consulting on NDINs as one of its specialties, was aware that it was required by FDA guidance to submit a new NDIN to cover the manufacture and sale of TruNiagen at this intake level, but purposefully disregarded this guidance in the belief that the minimal likelihood that a failure to adhere to the guidance would result in action by FDA did not justify the additional expense of preparing and submitting a new NDIN.

97.     ChromaDex thus has no applicable NDIN on file that covers its usage of Niagen in its TruNiagen product, rendering its statement in the Sham Petition that ChromaDex's Niagen is "the only source of NR that has an NDIN filed by the FDA" materially misleading.

98.     The fact that ChromaDex itself is knowingly guilty of the same violation—not having an applicable NDIN on file—of which it accuses Elysium in the Sham Petition demonstrates that ChromaDex had no real expectation that FDA would take action in response to the Sham Petition; if it had sincerely expected FDA to take action based on this alleged violation, it would have been effectively inviting FDA to take the same enforcement action, with corresponding deleterious effects to its business, against itself.

99.     Given ChromaDex's own knowing violation of the standards that it contended Elysium had not complied with and decision to publicly accuse Elysium of the same violation

anyway, it is apparent that ChromaDex had no real expectation that FDA would initiate the enforcement action it sought on such grounds and instead included such statements within the Sham Petition solely to further its goal of harming Elysium and assuming its market share.

## ChromaDex Spreads Its Lies

100.    Having launched this attack on Elysium, ChromaDex wasted no time in seeking to leverage the Sham Petition to undermine Elysium in the eyes of its current and potential customers, supply chain partners, investors, and advisors.

101.    ChromaDex's organized campaign of deception and self-promotion included both broad and specific targets.  To ensure that the fraudulent statements within the Sham Petition would reach its desired audience—customers and other participants in the NR consumer product market currently or prospectively doing business with Elysium—ChromaDex tipped off industry media outlets regarding the existence of the Sham Petition, including widely-read trade journal NutraIngredients-USA, which published an article on the Sham Petition on August 31, 2017. ChromaDex CEO Frank Jaksch had previously confirmed to Elysium that he had a personal relationship with the article's author, and the article itself featured a quotation from Jaksch.

102.    The article, which excerpts the statements from the Sham Petition regarding the "contamination" of Basis, also features information about the regulatory status of ChromaDex's Niagen and pTeroPure products that is missing from the Sham Petition and irrelevant to the article's purported subject, *i.e.*, the Sham Petition and Elysium's products.  This information instead has the effect of promoting ChromaDex's products by comparison to Elysium's allegedly "contaminated" Basis.

103.    ChromaDex further targeted its own shareholders for dissemination of the Sham Petition's misrepresentations, a group that also comprised, it knew, Elysium's own customers and individuals generally interested in the NR consumer market.

104. On August 31, 2017, George Johnson, an investment advisor barred by FINRA from the securities industry in February 2016 for multiple acts of misconduct, including share price manipulation on behalf of private equity clients and improper promotion of ChromaDex's own stock, forwarded a blog article entitled "Elysium Basis Adulterated with Toluene" to a blinded listserv, which included individuals who had signed up for ChromaDex investor alerts on chromadex.com and at least one New York resident, noting "Interesting reading for all you CDXC shareholders!!!"

105. The article credulously described and contained excerpts from the Sham Petition, including the statements that Basis was "contaminated with toluene," and repeated ChromaDex's misleading falsehood that "[t]he FDA has not set any allowed level of exposure to toluene through oral ingestion of a dietary supplement."

106. Further, on September 13, 2017, Johnson circulated to the same listserv an article entitled "ChromaDex and The IP Around NR," which noted that Elysium "appears to be marketing a knockoff version of Niagen." Though the author of the article described this alongside the ongoing litigation in California, the allegation that Elysium "knocked off" Niagen is clearly based on the false and misleading impression conveyed by the Sham Petition that Elysium's Basis is inferior to ChromaDex's competing product and contains a nicotinamide riboside that does not meet FDA standards.

107. Two weeks before circulating the first article regarding the Sham Petition, Johnson had circulated to the same listserv an email attaching an article from the same blog, entitled "Why I Feel Suckered By Elysium Health," which complained about Elysium's engagement in litigation with ChromaDex. He had written: "Interesting reading… See the link below. Go CDXC!!!"

108.    The email that Johnson forwarded showed that he had in fact been directly forwarded the article by ChromaDex's CEO, Frank Jaksch.

109.    Johnson disseminated both this article and the articles relating to the Sham Petition to the shareholder listserv, which included at least one New York resident, at the request of ChromaDex and for the purpose of damaging Elysium's and Basis's reputation and promoting ChromaDex's by contrast.

110.    In addition to these efforts at broader dissemination among people most likely to be interested in the NR consumer markets (and thus either current or potential customers of Elysium or ChromaDex), ChromaDex also specifically targeted individuals who would, it hoped, be receptive to its misrepresentations and whose reaction would be particularly injurious to Elysium.  On August 28, 2017, ChromaDex, through Professor Roger Kornberg, the chairman of its Scientific Advisory Board, began harassing several prominent members of Elysium's Scientific Advisory Board by email.  Citing the same "Why I Feel Suckered by Elysium Health" blog post that Johnson had previously circulated, Kornberg attempted to convince Elysium's advisors to sever their ties with the company based on its dispute with ChromaDex and the potential harm to their own reputations.  Kornberg extolled the honesty and decency of his ChromaDex colleagues, either unaware or deliberately omitting the fact of ChromaDex's principals' and major investors' involvement in numerous instances of questionable business practices, such as those described in Paragraph 26 above.

111.    Undeterred after one Elysium advisor counseled him that his understanding of the relations between Elysium and ChromaDex was incorrect, Kornberg forwarded to him the Sham Petition, noting that he had received the document from ChromaDex's leadership after requesting information on the parties' relationship.  Parroting the false and misleading statements in the

Sham Petition and information he received from ChromaDex management, Kornberg attempted again to persuade Elysium's advisor that Elysium was misleading him and selling a dangerous toluene-contaminated product, in purported contrast with ChromaDex, who had, he contended, obtained the requisite regulatory approvals for its product. Each such statement was false and misleading.

112. The following day, Kornberg emailed two of Elysium's advisors yet again, forwarding an email from Rob Fried, the former movie producer and securities fraud defendant ChromaDex had recently appointed as its President and Chief Strategy Officer.

113. In the email, Fried accused Elysium of "placing more than trace amounts of a known toxin in their adulterated version [of NR, *i.e.*, Basis] without a single safety study or stamp of approval offered by the very FDA that they claim doesn't regulate the industry. And without mentioning that known toxin on the label - toluene. And all the while advertising that they are safe and reputable and honest . . . ."

114. Fried went on: "What happened to scientific integrity and commitment to safety and saving the public from the unregulated supplements industry?" Elysium's Basis was, he commented sarcastically, "only a little toxic."

115. Fried's statements that Elysium "placed" "more than trace amounts" of a "known toxin" in Basis, and that Basis was "a little toxic" are false and misleading, as is evident from ChromaDex's own sale of a product containing "more than trace amounts" of the same "known toxin," and in light of Fried's utter lack of foundation to suggest that the presence of toluene could be attributed to Elysium "placing" it within the product, rather than its nature as a byproduct of the manufacturing process. His attacks on Elysium's business practices and character are similarly baseless and unwarranted.

116.     In forwarding this email, Kornberg yet again attempted to convince Elysium's advisors to rethink their association with the company and threatened that their affiliation with Elysium was in turn endangering their own reputations.

117.     Through this unsolicited outreach and dissemination of the false and misleading Sham Petition, as well as these baseless statements regarding Elysium, ChromaDex sought to convince Elysium's advisors to leave Elysium and thereby undermine Elysium's business, which depends (as Fried had recognized in his email) on Elysium's sterling reputation and the prestigious credentials of its management and advisors.

118.     On information and belief, ChromaDex has engaged in other efforts to publicize and disseminate the Sham Petition among current and potential customers and parties associated with Elysium, as well as among individuals interested in the NR supply market, which will be revealed by further discovery.

**Elysium Sustains Injury to Its Business**

119.     While only weeks have passed since the filing of the Sham Petition and since the Sham Petition was publicized by ChromaDex, Elysium has already begun to experience the injurious effects of ChromaDex's targeted and sustained campaign of misinformation and efforts to seize Elysium's market share.

120.     The filing of the Sham Petition and publication of articles repeating its false and misleading statements regarding the "contamination" of Basis sparked considerable concern on the part of Elysium's health-conscious customer base and potential customers, as well as others in the industry, exactly as ChromaDex intended.

121.     Elysium's customer service team immediately began fielding inquiries from customers anxious about their potential exposure to what ChromaDex had described in the Sham Petition as a "toxic industrial solvent."  A number of customers canceled their monthly or annual

28

Basis subscriptions, and several expressly cited their concern over toluene exposure, based on ChromaDex's false and misleading Sham Petition, as the reason behind their decision. This group includes (i) five customers, who had previously had pay-as-you-go subscriptions and had been customers of Elysium's for between one and eighteen months; (ii) four semi-annual subscription customers, who had been customers of Elysium's for between several weeks and eighteen months; and (iii) three annual subscription customers, who had been customers of Elysium's for between four and eighteen months. Based on the information it maintains regarding customer retention, Elysium calculates the loss of revenue from these customers to equal $10,680.

122.    The concerns about toluene exposure animating these cancellations were based entirely on the misleading statements in the Sham Petition, which deceived Elysium's customers and potential customers into believing that they had sustained dangerous toluene exposure from their past ingestion of Basis and would sustain dangerous toluene exposure were they to ingest Basis going forward.

123.    While ChromaDex's efforts at disseminating its fraudulent statements to date have had only limited pecuniary effect in the form of attrition of Elysium's existing customer base given the short amount of time since the statements were published and publicized, Elysium expects that this attrition will continue and that more consumers and potential consumers will be duped into believing that they have been or will be injured from ingestion of Basis as the statements in the Sham Petition are further circulated by ChromaDex and those acting on its behalf.

124.    Further, as comments left by members of the public on related internet articles and social media outlets have made clear, the Sham Petition has tarnished Elysium's reputation

and convinced numerous potential customers not to purchase Basis, again as ChromaDex intended.

125. The harm was not limited to Elysium's loss of customers. Predictably, the false reports that Elysium's Basis was "contaminated" with "paint thinner" made numerous other parties wary about being associated with Elysium, further undermining it and enabling ChromaDex's assumption of its market share.

126. On August 31, 2017, an ingredient supplier (the "Lost Supplier") with whom Elysium had been exploring a long-term relationship forwarded Elysium one of the articles describing the Sham Petition and informed Elysium that because of the situation, it was no longer interested in exploring a partnership and refused to do business with Elysium.

127. The Lost Supplier manufactures and sells a plant extract (the "Glycoside") that has the highest concentration for a specific glycoside that is the subject of Elysium's latest development efforts.

128. In addition to being the highest-concentration form available, the Glycoside is also the only version of the extract on the market that has achieved the required regulatory approvals and thus the only commercially available form of the extract that is appropriate for Elysium's purposes.

129. Prior to the dissemination of the Sham Petition by ChromaDex and its feature in media outlets, Elysium had collaborated with the Lost Supplier on a joint project by which the Lost Supplier would provide the Glycoside to Elysium on an exclusive basis for inclusion in an upcoming product.

130.   Before revealing that it would back out as a result of ChromaDex's false accusations, the Lost Supplier had expressed enthusiasm for working with Elysium, and Elysium had already undertaken to organize a pharmacokinetics study relying on the Glycoside.

131.   Because of this rejection arising from ChromaDex's misrepresentations and the dearth of available market substitutes with the requisite regulatory approvals, Elysium's development plans must be postponed while it pursues regulatory approval for an alternative extract to be used in its product.

132.   Elysium estimates that this delay in bringing the new product to market, anticipated to be about eighteen months, coupled with the additional costs from obtaining regulatory approval (including the costs of multiple studies and preparation of a dossier for a GRAS application) rather than relying on the Glycoside's existing regulatory status, have resulted in the loss of $1,944,000 in revenue and additional costs of $495,000, which constitutes $2,439,000 in injury directly connected to ChromaDex's misconduct.

133.   Several other of Elysium's supply chain partners expressed similar concerns relating to the Sham Petition, and one even insisted that Elysium agree to indemnify it against any potential liability relating to its services for Elysium.

134.   Elysium has further received inquiries from investors and potential investors expressing concern about the Sham Petition, the safety of Elysium's products, and Elysium's future in light of the damage to its reputation.

135.   ChromaDex intended to induce such disruptions to Elysium's relationships by injuring its reputation and the reputation of Basis, and these disruptions are the foreseeable consequences of its dissemination of the false and misleading statements in the Sham Petition.

## CLAIMS FOR RELIEF

## COUNT I

### (Violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a))

136. Elysium incorporates and re-alleges each and every allegation in paragraphs 1 to 135 above as if fully set forth herein.

137. ChromaDex's efforts to publicize and disseminate the Sham Petition and the false and misleading statements therein violates Section 43(a) of the Lanham Act, which prohibits ChromaDex from using false and misleading descriptions of fact or representations of fact that misrepresent the nature, characteristics, or qualities of its or another person's goods and services.

138. The false and misleading message regarding the respective safety and product quality of Elysium's and ChromaDex's competing nicotinamide riboside products conveyed by the statements in the Sham Petition is highly material to consumer purchasing decisions.

139. Elysium has suffered and will continue to suffer damages and further irreparable harm for which there is no adequate remedy at law as a result of ChromaDex's false and/or misleading advertising.

140. ChromaDex's conduct was willful and malicious and made with the knowledge that its statements were false and misleading.

## COUNT II

### (Trade Libel)

141. Elysium incorporates and re-alleges each and every allegation in paragraphs 1 to 140 above as if fully set forth herein.

142. ChromaDex's statements within the Sham Petition regarding the alleged danger of Basis and its contamination with a "toxic industrial solvent" were false and misleading because they omitted material information revealing that the levels of toluene purportedly found within

32

the samples of Basis were well within the standards adopted by FDA and did not pose a danger to consumers.

143.    ChromaDex published these false and misleading statements by including them within the Sham Petition, which was publicly filed with FDA, and then again by disseminating the Sham Petition through statements to the media and by forwarding the Sham Petition, related media coverage, and its own commentary to members of the public and Elysium's own advisors.

144.    ChromaDex acted with malice in knowingly making these false statements with the goal of disparaging Elysium's product and tarnishing its reputation among potential and current customers, supply chain partners, advisors, and investors as part of a campaign to plunder Elysium's market share for its own competing product.

145.    ChromaDex's publication of the false and misleading statements within the Sham Petition have led to the loss of future sales, existing customer relationships, and a prospective supply chain partner relationship, resulting in actual pecuniary damages amounting to (i) the lost revenue from canceled subscriptions and orders and refunds Elysium has been forced to issue to its customers, resulting in lost revenue calculated at $10,680; and (ii) the revenue Elysium has lost as a result of the product development delays arising out of ChromaDex's misconduct and additional development costs it will bear, calculated at $2,439,000.

146.    Elysium continues to be damaged as a result of ChromaDex's misconduct, in an amount to be determined at trial.

## COUNT III

**(Deceptive Business Practices, New York General Business Law § 349)**

147.    Elysium incorporates and re-alleges each and every allegation in paragraphs 1 to 146 above as if fully set forth herein.

148.    ChromaDex was aware at the time of filing the Sham Petition that its statements regarding the danger of trace amounts of toluene in Elysium's Basis and the lack of standards promulgated by FDA relating to toluene were false, as is evident from its own manufacture and sale of a product containing similar amounts of toluene and reliance on corresponding standards adopted by FDA.

149.    ChromaDex further was aware that its statements regarding Niagen's regulatory status were false and/or misleading because they were based in turn on knowing misrepresentations by ChromaDex regarding the cGMP compliance of the facility in which the Niagen was manufactured and knowing misrepresentations regarding the existence of an applicable NDIN for ChromaDex's Niagen.

150.    ChromaDex's act of knowingly filing a citizen petition with FDA that contained misrepresentations regarding the safety of Elysium's Basis and the safety of its own product, and publicizing those statements through coordinating their feature in the media and directly disseminating the statements to Elysium customers, constitutes a consumer-oriented practice designed to interfere with the decision-making process of FDA, waste FDA resources, and mislead the public regarding the safety and quality of Basis, Niagen, and TruNiagen, including Elysium's current and potential customers located within New York, contrary to the public interest.

151.    ChromaDex's knowing inclusion of false and misleading statements within the Sham Petition is likely to materially mislead a reasonable consumer regarding the safety of Elysium's Basis, thereby creating unfounded concern about a danger that does not exist, and mislead a reasonable consumer regarding the safety of ChromaDex's own competing nicotinamide riboside product.

152. Elysium has suffered actual injury as a result of ChromaDex's deceptive business practice, including the loss of existing customers, calculated at $10,680, loss of future sales, and losses emanating from the departure of a potential supply chain partner, resulting in increased development costs and lost sales arising from delay calculated at $2,439,000.

## COUNT IV

### (Tortious Interference with Prospective Economic Relations)

153. Elysium incorporates and re-alleges each and every allegation in paragraphs 1 to 152 above as if fully set forth herein.

154. At the time of ChromaDex's misconduct, Elysium was engaged in a number of actual and prospective business relationships with its current and potential customers, investors, advisors, and supply chain partners.

155. ChromaDex was aware of the existence of these relationships and intentionally interfered with those relationships by filing and publicizing the Sham Petition.

156. ChromaDex's dissemination of the misleading and false statements within the Sham Petition, and related efforts to publicize those fraudulent statements by inviting press attention and contacting Elysium's advisors, constitute the employment of wrongful means made for the purpose of harming Elysium and improperly promoting its own competing nicotinamide riboside product.

157. Through this wrongful conduct, ChromaDex has interfered with Elysium's existing and prospective business relationships with existing and potential customers and a potential supply chain partner. As a direct result of ChromaDex's misconduct, Elysium has suffered damages, including but not limited to the loss of revenue from foregone sales and potential customers and increased development costs and loss of revenue from the demise of a

potential partnership, and continues to be damaged as a result of ChromaDex's misconduct, in an amount to be determined at trial.

**WHEREFORE**, Plaintiff Elysium prays for judgment:

(1) For all remedies available by reason of ChromaDex's false advertising, including, without limitation, compensatory, enhanced, and exemplary damages in amounts to be determined at trial, and injunctive relief enjoining ChromaDex from disseminating or causing to be disseminated or published any materials, including advertisements or other promotion materials, containing the claims challenged in this Complaint;

(2) For all remedies available by reason of ChromaDex's trade libel, including, without limitation, compensatory and punitive damages;

(3) For all remedies available by reason of ChromaDex's deceptive business practices, including, without limitation, injunctive relief enjoining ChromaDex from continued dissemination of its misrepresentations regarding Elysium's Basis, and actual and punitive damages;

(4) For all remedies available by reason of ChromaDex's act of tortious interference with prospective economic relations, including, without limitation, compensatory damages;

(5) Awarding Elysium the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

(6) For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff Elysium respectfully requests a trial by jury on all issues so triable.

Dated:  New York, New York
        September 27, 2017

Respectfully submitted,

/s/ Joseph N. Sacca
Joseph N. Sacca
Michael M. Powell
Spencer A. Gottlieb
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
*Counsel for Plaintiff Elysium Health, Inc.*