UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 04/19/2022
```

-------------------------------------------------------------------X
                                                  :

*In re Elysium Health–ChromaDex Litigation*      :           17-cv-7394 (LJL)

                                                  :       OPINION AND ORDER

-------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

      Plaintiff ChromaDex, Inc. ("ChromaDex") moves to enforce a settlement agreement with

Defendant Elysium Health, Inc. ("Elysium").[1]  Dkt. No. 303.

      The long and torturous procedural history of this case is recounted in the Court's

February 11, 2022 Opinion and Order granting in part and denying in part summary judgment

motions, Dkt. No. 302, and in the Court's January 19, 2021 Opinion and Order granting in part

and denying in part Elysium's motion to file Supplemented and Fourth Amended Counterclaims,

Dkt No. 171.  The summary judgment opinion also recounts the other litigation between the

parties relating to the launch by each party of their principal products.  Dkt. No. 302 at 10.

Approximately two hours before the Court's summary judgment opinion was released, the

General Counsel of Elysium sent the head of ChromaDex's legal department an email accepting

a settlement proposal conveyed the prior day by ChromaDex.  A little over a week later, and

after reviewing the Court's opinion and order (which granted Elysium's motion for summary

---

[1] Elysium is also the Counterclaim-Plaintiff, and ChromaDex is the Counterclaim-Defendant;
however, for ease of reference, the Court refers to ChromaDex as Plaintiff and Elysium as
Defendant throughout.

judgment, dismissing ChromaDex's complaint in full, and partially granted ChromaDex's motion for summary judgment, allowing some of Elysium's counterclaims to survive), Elysium wrote ChromaDex that the parties did not have an agreement.  ChromaDex now seeks to enforce the settlement terms reflected in the email from Elysium's General Counsel.  The Court first recounts the relevant undisputed facts.  It then discusses the applicable principles of law.

## UNDISPUTED FACTS

### I.     Litigation Between the Parties

ChromaDex and Elysium are parties to numerous lawsuits, pending in several different federal courts, arising from Elysium's launch of a dietary supplement called Basis and ChromaDex's launch of a dietary supplement called Tru Niagen.  The two products compete with one another.  The complaint in this case (the "New York Action") was filed by ChromaDex on September 27, 2017 and alleges claims for false advertising under the Lanham Act, 15 U.S.C. § 1125(a), federal unfair competition under the Lanham Act, and deceptive practices under New York General Business Law § 349.  Elysium's counterclaims allege claims under the same statutes as those alleged in the complaint—false advertising under the Lanham Act, federal unfair competition under the Lanham Act, and deceptive practices under New York General Business Law § 349.

The two companies also are adversaries in a lawsuit filed in the United States District Court for the Central District of California in December 2016 (the "California Action") in which ChromaDex brings claims for breach of contract, breach of fiduciary duty, and misappropriation of trade secrets, and Elysium alleges that ChromaDex violated a most-favored-nations clause and is liable for fraudulent inducement, patent misuse, and unjust enrichment.  That case resulted in a verdict in late September 2021 in which the jury found for ChromaDex on certain of its claims and for Elysium on other claims, resulting in a total net award to ChromaDex of $1,100,658 with

prejudgment interest and attorney's fees yet to be decided, plus the possibility of additional post-trial motions and appeals; Elysium retained a patent misuse counterclaim, which was bifurcated for a separate bench trial and stayed pending the outcome of the litigation in Delaware.  In 2018, ChromaDex sued Elysium for patent infringement in the United States District Court for the District of Delaware (the "Delaware Action"), alleging that Elysium's Basis product infringed various ChromaDex patents.  On September 21, 2021, the Delaware District Court granted Elysium's motion for summary judgment, holding that ChromaDex's patent claims were invalid.

## II.    The February 2022 Settlement Discussions

In this case, after lengthy discovery, each party filed motions for summary judgment and *Daubert* motions.  Dkt. Nos. 197, 199, 203, 204.  On December 8, 2021, the Court issued an Order scheduling oral argument for January 10, 2022, Dkt. No. 294, and on January 10, 2022, the Court heard oral argument.

In January 2022, the parties conducted settlement discussions to settle both this action and the California Action.  The parties generally agreed on a settlement amount of $2.5 million from Elysium to ChromaDex to settle both cases but did not reach agreement on the timing of the payments.  ChromaDex sought payment of the $2.5 million in a single lump sum; Elysium sought to split the payment into two equal installments.  Dkt. No. 305 ¶ 2.

On Wednesday, February 2, 2022, after oral argument had been heard on the motions for the summary judgment and *Daubert* motions in this case, William Carter, Senior Vice President of Business Affairs and legal counsel at ChromaDex, called Thomas Wilhelm, General Counsel for Elysium, to convey a settlement offer on behalf of ChromaDex (the "February 2 Call").  The settlement offer consisted of the following terms: (1) the payment by Elysium of $2.5 million in two separate installments to resolve the entire action in this Court and all outstanding issues in

the California Action including the issue of prejudgment interest; (2) the filing of a stipulated judgment in the amount of $2.5 million in the California Action, with $1.25 million to be paid in February 2022 and the second payment to be made one year from the first payment; (3) Elysium's agreement that interest would accrue on the second payment from the date of the settlement agreement but would be waived if payment was timely made and that ChromaDex would be entitled to seek attorney's fees incurred in collecting the second payment should Elysium fail to make it on time; (4) the parties' agreement not to seek attorney's fees or costs arising from the California Action and not to file any post-trial motions or appeals related to the claims and counterclaims tried to the jury in the California Action; and (5) the mutual dismissal with prejudice of all claims and  counterclaims in the New York Action, with each side bearing its own attorney's fees and costs.  *Id.* ¶ 3.  Mr. Carter told Mr. Wilhelm that if Elysium agreed to the terms stated the parties would have a deal and Mr. Wilhelm indicated that he understood the offer and would discuss it with Elysium and get back to Mr. Carter as soon as possible.  *Id.* ¶ 4.

On Thursday, February 3, 2022, at 12:02 p.m., Mr. Wilhelm sent an email to Mr. Carter responding to the offer conveyed on the prior day (the "February 3 Email").   *Id.* ¶ 6.  Because the contents of the email are central to this dispute, the Court quotes it in full:

> Bill-
>
> Following our call yesterday, we discussed your settlement proposal. Under the circumstances it was a tough sell. The recent hearing in New York and the briefing in California weighed heavily against accepting what is basically the same offer that you rejected in January. There was considerable pressure to modify the economics. In the end, however, we can accept the additional terms you proposed yesterday.
>
> I share this not to try and gain leverage moving forward but to make this point: we will not accept any additional "guarantees" or conditions beyond the two you described yesterday (i.e., interest that accrues but is forgiven/waived provided the 2nd payment is made on time and the ability to get fees if the matter goes to collection).

If I am remembering correctly these were the other terms, modified to reflect that it's now February, not January:

    1.      Elysium would agree to pay ChromaDex a total of $2.5 million to resolve any outstanding issues with respect to the claims and counterclaims tried to the jury in the California action, including the issue of prejudgment interest, as well as the entire New York action.

    2.      Pursuant to Fed. R. Civ. P. 54(b), the parties would agree to request that the Court enter a stipulated judgment in this amount with respect to the claims and counterclaims tried to the jury in the California action.

    3.      The stipulated judgment would be paid in two equal installments of $1.25 million each. The first would be paid on February X, 2022. The second would be paid on or before February X, 2023.

    4.      All parties would agree not to seek attorney's fees or costs arising from the claims and counterclaims tried to the jury in the California action. The parties would further agree not to file any other post-trial motions or appeals related to the claims and counterclaims tried to the jury in the California action.

    5.      The parties would agree to a mutual dismissal with prejudice of all claims and counterclaims raised in the New York action, with each side bearing its own attorney's fees and costs.

I understand that now that we have an agreement you will get started on the documentation. Let me know if there are any other next steps.

Best Regards,

Tom

Dkt. No. 305-1.

    The terms summarized in the second paragraph of the email as they pertain to interest and attorney's fees and those in the numbered paragraphs track the terms conveyed by Mr. Carter to Mr. Wilhelm the prior day. Dkt. No. 305 ¶ 6.

    That same day, and apparently after Mr. Wilhelm sent his email, the Court issued its Opinion and Order on the motions for summary judgment and on the *Daubert* motions. The Court's order on the public docket recited that the parties' motions for summary judgment and *Daubert* motions were each granted in part and denied in part and that the Court's Opinion was

5

being filed under seal in order to preserve the ability of the parties to move the Court for redactions of material that should be maintained under seal.  Dkt. No. 295.  The Court's 113-page summary judgment opinion made available to the parties on that date recited that ChromaDex's complaint was dismissed in full and that Elysium's counterclaim would survive in part.  Dkt. No. 296 at 113.  In its the *Daubert* opinion, the Court denied ChromaDex's motion to exclude the opinions of Elysium experts Brian Sowers, granted Elysium's motion to exclude portions of the opinions of ChromaDex expert Bruce Isaacson, granted Elysium's motion to exclude the expert testimony of ChromaDex damages expert Lance Gunderson, denied the motion to exclude the testimony of Elysium expert Colin Weir, granted in part and denied in part Elysium's motion to exclude the testimony of ChromaDex expert Steven M. Weisman, and granted Elysium's motion to exclude the testimony of ChromaDex expert Kurt Hong.  Dkt. No. 297.

At 2:48 p.m., on February 3, 2022, Mr. Wilhelm wrote Mr. Carter an email stating: "With the decision in New York (that we still haven't seen in full), please hold off on drafting the documentation.  We need to understand the decision and see how it impacts settlement."  Dkt. No. 305 ¶ 7.  Minutes later, at approximately 2:54 p.m., Mr. Carter responded:  "Tom I haven't seen the ruling either but the settlement structure and amount isn't impacted."  *Id.*  Mr. Wilhelm immediately replied:  "Bill – from our perspective that is not true.  We can resume settlement discussions after we have had time to evaluate and digest the decision."  *Id.*  Mr. Carter responded:  "Let's discuss once you review.  I'm a bit confused by your earlier statement 'I understand that now that we have an agreement you will get started on the documentation.'"  *Id.*  Mr. Wilhelm then replied:  "Just to be clear – with the decision in New York, again not having reviewed yet – settlement discussions are now on hold.  We need to understand the NY decision

to decide if anything has changed.  Obviously moving forward with settlement depended on agreeing on the documentation and from our conversation yesterday I understood you would be preparing.  That was the origin of the statement from my prior email."  *Id.*  All of the emails were sent within a span of fifteen minutes.

On Wednesday, February 9, 2022, Mr. Carter sent an email to Mr. Wilhelm:  "Tom: I haven't heard anything from you/Elysium since last Thursday.  The parties' settlement agreement is memorialized in your email sent to me last Thursday (February 3).  We will begin drafting the filings to inform the respective courts of the agreement and send the drafts to you for Elysium's approval to file."  *Id.* ¶ 8.  Mr. Wilhelm responded the following day: "The parties clearly do not have an agreement as I told you last Thursday.  We are still open to discussing new terms, including ones that reflect the changed circumstances in New York, but as of now the cases are proceeding."  *Id.*

## III.    Prior Settlement Discussions

The January/February 2022 settlement discussions were not the first between the parties.  The parties first attempted to settle the cases at mediation in or around January 2018 before a private mediator.  Dkt. No. 314 ¶ 3.  In addition, the parties participated in settlement conferences before a magistrate judge in the California Action in or around August 2019 and a magistrate judge in the Delaware Action in or around May 2020, as well as in multiple mediations and settlement discussions with another private mediator in the years following.  *Id.* ¶ 4.

In August 2021, in the lead-up to the trial in the California Action and before the ruling in the Delaware Action, the parties exchanged further communications regarding a potential global settlement.  *Id.* ¶ 6; Dkt. No. 314-1.  The "conceptual" terms of the agreement included a supply

agreement from ChromaDex to Elysium of nicotinamide riboside ("NR")[2] with a third party (later identified as W.R. Grace) producing the material to be supplied, the coordination of research and development efforts, discussions between the parties regarding finished product manufacturing synergies, ChromaDex's assistance in facilitating discussions between Elysium and the third party regarding supply and settlement, and limitations on the channels through which Elysium and/or ChromaDex would sell their products, as well as, potentially, the use of ChromaDex's NIAGEN mark on Basis and on Elysium's website.  Dkt. No. 314-1.  An email from ChromaDex's to Elysium setting forth the general terms of a settlement contained language that "all the terms, once finalized will require approval by both sides and thus these are not final and subject to change."  *Id.*   It also contained the warning that: "as we get closer to trial and incur additional cost, the price to settle will only increase.  And there is a point of no return after which the window of opportunity in front of us now closes."  *Id*.  The response from Elysium made clear that the parties were far apart on the monetary element of the settlement—it notes that in settlement discussions ChromaDex "threw out the number $15m" but Elysium "would be willing to come up to $2m"—as well as on the other terms and that the settlement terms would have "to take into account the recent developments in the litigations that have been favorable to Elysium and bad for ChromaDex," including those in the Delaware Action.  *Id.*

The August 2021 discussions culminated in a Confidential Global Settlement Proposal, dated September 1, 2021, signed by ChromaDex's then–litigation counsel, and emailed to Elysium on September 2, 2021.  Dkt. No. 314 ¶ 7; Dkt. No. 314-2.  The three-page settlement

---

[2] Synthetically produced isolated NR is the active ingredient in ChromaDex's Tru Niagen and one of the two active ingredients in Elysium's Basis.  It is a naturally occurring form of Vitamin $B_3$ that increases nicotinamide adenine dinucleotide or NAD+, an essential coenzyme required for life and cellular functions that is linked to cellular health and cellular aging.  By increasing NAD+, NR is believed to improve cellular health and slow cellular aging.

proposal begins:  "This term sheet is non-binding and non-final in all respects and may be withdrawn by ChromaDex at any time, in whole or in part.  Any agreement with respect to the matters set out in this term sheet would become binding on the parties only when and if the parties enter into one or more definitive agreements regarding such subject matter."  Dkt. No 314-2.  In particular, it contains a proposal that the parties would reach two definitive agreements.  The first was a global settlement agreement addressing all pending litigation between the parties.  The second was a supply agreement with respect to the ongoing sale of NR. Among the material terms are a payment from Elysium to ChromaDex of $18 million, dismissals of all outstanding litigation, an agreement by ChromaDex to use its best efforts to facilitate a settlement meeting between W.R. Grace and Elysium, covenants regarding intellectual property, an agreement by Elysium to purchase all needed NR from ChromaDex or ChromaDex authorized ingredient suppliers, and the adoption by Elysium of NIAGEN as an ingredient identifier.  *Id.*  The record contains an email from Elysium dated September 8, 2021 asking whether there has been downward movement by ChromaDex on the settlement amount, the requirement to use the NIAGEN mark on Basis, and the ability of Elysium to use other suppliers for NR, as well as the approach for settling Elysium's case with W.R. Grace (noting that if any of those were not met, there would be "no point in discussing").  Dkt. No. 314 ¶ 8; Dkt. No. 314-3.  It also contains a response from Mr. Carter on September 9, 2021 that he had updates and a call would be "productive" and that, "Of course, our discussions won't be binding until reduced to a formal final agreed upon writing."  Dkt. No. 314 ¶ 8; Dkt. No. 314-3.

Ultimately, these settlement discussions were unsuccessful, and no settlement was reached between the parties before trial started in California.  Dkt. No. 318 ¶ 3.  Summary

judgment was granted in the Delaware Action.  A jury trial was held in California.  On

September 27, 2021, the jury returned its verdict in the California Action.  Dkt. No. 314 ¶ 9.

## APPLICABLE PRINCIPLES OF LAW

"A district court has the power to enforce summarily, on motion, a settlement agreement

reached in a case that was pending before it."  *Velazquez v. Yoh Services, LLC*, 2017 WL

4404470, at *2 (S.D.N.Y. Sept. 25, 2017) (internal quotation marks omitted) (quoting *BCM*

*Development, LLC v. Oprandy*, 490 F. App'x 409, 409 (2d Cir. 2013) (summary order)); *see also*

*Omega Engineering Inc. v. Omega, S.A.*, 432 F.3d 437, 444 (2d Cir. 2005) ("A trial court has

inherent power to enforce summarily a settlement agreement when the terms of the agreement

are 'clear and unambiguous.'" (quoting *Audubon Parking Associates Ltd. Partnership v. Barclay*

*& Stubbs, Inc.*, 626 A.2d 729, 723 (Conn. 1993)); *Meetings & Expositions, Inc. v. Tandy Corp.*,

490 F.2d 714, 717 (2d Cir. 1974) ("A district court has the power to enforce summarily, on

motion, a settlement agreement reached in a case that was pending before it.").  "The party

seeking to enforce the purported agreement bears the burden of proving that the parties entered

into a binding agreement."  *Velazquez*, 2017 WL 4404470, at *2; *see also Bluelink Marketing*

*LLC v. Carney*, 2017 WL 4083602, at *5 (S.D.N.Y. Sept. 15, 2017).

The parties agree that the four-factor test set forth in *Winston v. Mediafare Entertainment*

*Corp.*, 777 F.2d 78 (2d Cir. 1985), should be used to determine whether the "parties intended to

be bound by a settlement agreement in the absence of a document executed by both sides,"

*Ciaramella v. Reader's Digest Ass'n, Inc.* 131 F.3d 320, 323 (2d Cir. 1997).  The four *Winston*

factors are: "(1) whether there has been an express reservation of the right not to be bound in the

absence of a signed writing; (2) whether there has been partial performance of the contract; (3)

whether all of the terms of the alleged contract have been agreed upon; and (4) whether the

agreement at issue is the type of contract that is usually committed to writing." *Ciarmella*, 131 F.3d at 323; *see also Powell v. Omnicom*, 497 F.3d 124, 129 (2d Cir. 2007).[3]

## DISCUSSION

ChromaDex asserts that the parties had an enforceable agreement as a result of the February 2 Call and the February 3 Email. It argues that the February 2 Call constituted an offer containing all of the material terms of a settlement agreement and the February 3 Email constituted an acceptance, and Elysium reneged only as a result of the Court's decision on the motions for summary judgment and the *Daubert* motions.

In applying the four *Winston* factors to a particular case, the first factor "is frequently the most important." *Brown v. Cara*, 420 F.3d 148, 154 (2d Cir. 2005). Here, it weighs in favor of a finding that there is an enforceable settlement agreement. This case is not like *Kaczmarcysk v. Dutton*, 414 F. App'x 354 (2d Cir. 2011), or *Ciaramella*, 131 F.3d at 322, in which the parties exchanged a draft settlement agreement that stated that it would not become effective until it was signed by the parties. Neither the contents of the February 2 Call nor those of the February 3 Email are conditional in any respect; neither reflect an intent not to be bound absent a written agreement signed by both sides. *See Geneva Laboratories Ltd. v. Nike West African Import and Export Inc.*, 2021 WL 7287611, at *5 (E.D.N.Y. Aug. 16, 2021), *report and recommendation adopted*, 2022 WL 673257 (E.D.N.Y. Mar. 7, 2022) ("The first factor is satisfied when there has been no express reservation, and when the circumstances and actions of the parties indicate no reservation, of the right not to be bound absent a written agreement." (first citing *Conway v.*

---

[3] The Second Circuit has declined to decide whether the settlement of federal claims is governed by New York law or federal common law. *See Figueroa v. New York City Department of Sanitation*, 475 F. App'x 365, 366 (2d Cir. 2012) (summary order); *Powell*, 497 F.3d at 129 n.1. It has concluded, however, that as relevant here "New York law and federal common law [are] materially indistinguishable." *Powell*, 497 F.3d at 129 n.1.

*Brooklyn Union Gas Co.*, 236 F. Supp. 2d 241, 249 (E.D.N.Y. 2002); and then citing *R.G. Grp., Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 74 (2d Cir. 1984))).  Mr. Carter declares, without contradiction, that he stated on the February 2 Call that if Elysium agreed to the terms he laid out then the parties would have a deal and that neither he nor Mr. Wilhelm stated that the settlement agreement (should Elysium accept the offer) would be contingent on a signed document.  Dkt. No. 305 ¶¶ 4–5.  The language of Mr. Wilhelm's February 3 email contains no express reservation and no indication of an intent not to be bound in the absence of a further written agreement.  The February 3 email states unambiguously "we have an agreement."  The fact that the February 3 email goes on to state that Elysium "will get started on the documentation" does not weigh against a finding that the parties intended to be bound.  A preliminary contract can have binding force "when the parties have reached complete agreement (including the agreement to be bound) on all the issues perceived to require negotiation.  Such an agreement is preliminary only in form—only in the sense that the parties desire a more elaborate formalization of the agreement."  *Teachers Insurance & Annuity Ass'n of America v. Tribune Co.*, 670 F. Supp. 491, 498 (S.D.N.Y. 1987).  "[T]he mere fact that the parties contemplate memorializing their agreement in a formal document does not prevent their informal agreement from taking effect prior to that event."  *Hostcentric Techs., Inc. v. Republic Thunderbolt, LLC*, 2005 WL 1377853, at *5 (S.D.N.Y. June 9, 2005) (internal quotation marks omitted) (quoting *V'Soske v. Barwick*, 404 F.2d 495, 499 (2d Cir.1968), *cert. denied,* 394 U.S. 921 (1969)).  Mr. Wilhelm's reference is fairly read to refer to the "documentation" of an agreement that has already been reached.  It cannot be read to refer to the need for further writings for the parties to actually come to an agreement.

Elysium argues that it expressed an intent not to be bound absent a further writing because in connection with the earlier settlement offers ChromaDex conveyed prior to the trial in the California Action and prior to the summary judgment decision in the Delaware Action, ChromaDex stated that "[a]ny agreement with respect to the matters set out in this term sheet would become binding on the parties only when and if the parties enter into one or more definitive agreements regarding such subject matter" and further stated "our discussions won't be binding until reduced to a formal final agreed upon writing." Those arguments are not sufficient to create a triable issue of fact. By its terms, ChromaDex's reservation with respect to the offer contained in the September 2, 2021 term sheet was limited to agreements "with respect to the matters set out in this term sheet." It involved the settlement of this action, the California Action, the Delaware Action, and all claims between the parties (including other intellectual property claims) for a large sum of money and a supply agreement between the parties. That offer, however, was never accepted, and the California Action and the Delaware Action both proceeded.

The offer reflected in the February 2 Call and accepted by the February 3 Email was fundamentally different and far simpler. It involved the simple payment of money in two separate installments for a stipulated judgment in the California Action and a dismissal without prejudice by both sides in this action. It did not contemplate any continuing relationship between the parties, and there would have been no need for extensive documentation between the parties. Thus, when it was conveyed by ChromaDex, the offer did not contain any express or implicit reservations. ChromaDex did not express a requirement for a more formal settlement agreement before each party would be bound. All that was necessary was to prepare the documentation to effect what had already been agreed.

The second factor asks whether there has been partial performance of the contract. "[P]artial performance is an unmistakable signal that one party believes there is a contract; and the party who accepts performance signals, by that act, that it also understands a contract to be in effect." *R.G. Grp.*, 751 F.2d at 75–76. "To have partial performance, there must be some actual performance of the contract, such that the party asserting the existence of the contract conferred something of value upon the party disclaiming existence of the contract, which the latter party accepted." *Grgurev v. Licul*, 2016 WL 6652741, at *5 (S.D.N.Y. Nov. 10, 2016) (internal quotation marks omitted and alterations adopted) (quoting *Nieves v. Community Choice Health Plan of Westchester, Inc.*, 2011 WL 5531018, at *4 (S.D.N.Y. Nov. 14, 2011)). This factor is neutral on the facts here. One week passed between the February 2 Call and February 3 Email and Elysium's email definitively stating that it would not abide by the terms set forth in those documents. ChromaDex did not perform any part of its obligation under the agreement; until Elysium prepared the stipulated judgment and notice of dismissal there was nothing for ChromaDex to perform. Elysium "repudiated the agreement before the judgment was signed." *Scheinmann v. Dykstra*, 2017 WL 1422972, at *4 (S.D.N.Y. Apr. 21, 2017) (citing *Hostcentric*, 2005 WL 1377853 at *8).

Elysium argues that ChromaDex did not partially perform because it maintained its motion for prejudgment interest in the California Action and never attempted to withdraw it. Dkt. No. 315 at 13. But the failure to withdraw the motion certainly does not signal a belief on the part of ChromaDex that no agreement existed. The motion for prejudgment interest in the California Action was noticed for February 14, 2022. Dkt. No. 218 ¶ 6. Mr. Carter emailed Mr. Wilhelm on February 9, 2022, reiterating his position that the parties reached an agreement on February 3, 2022, and informed Elysium on February 9 that ChromaDex would prepare joint

papers to inform the Court of the settlement.  Mr. Wilhelm responded that the parties did not

reach an agreement.  ChromaDex immediately filed this motion to enforce.  It was not required

to do more.

The third factor also weighs in favor of ChromaDex and finding an enforceable

settlement agreement.  "The Second Circuit has clarified that the third *Winston* factor [evaluates]

whether the parties have agreed 'on all *material* terms.'" *Estate of Andrea Brannon v. City of*

*New York*, 2016 WL 1047078, at *2 (S.D.N.Y. Mar. 10, 2016) (Nathan, J.) (quoting *Ciaramella*,

131 F.3d at 325); *see also Scheinmann v. Dykstra*, 2017 WL 1422972, at *4 (S.D.N.Y. Apr. 21,

2017) (citing cases); *Grgurev*, 2016 WL 6652741, at *6 ("[C]ourts analyzing this factor focus on

whether the parties reached agreement with respect to all *material* terms").  The February 2 Call

and the February 3 Email reflect agreement on all of the material terms.  The communications

reflect agreement on: (1) the total amount of the settlement—$2.5 million; (2) what the

settlement is for—the resolution of "any outstanding issues with respect to the claims and

counterclaims tried to the jury in the California action, including the issue of prejudgment

interest, as well as the entire New York action"; (3) the form and timing of the payments—two

installments, the first of which would be paid in February 2022 and the second of which would

be paid in February 2023; (4) the payment of interest—"interest that accrues but is

forgiven/waived provided the 2nd payment is made on time and the ability to get fees if the

matter goes to collection"; (5) the issue of attorney's fees—the parties would agree not to seek

attorney's fees and costs from one another; and (6) the forms that the settlements would take—a

stipulated judgment in the California Action and a dismissal with prejudice of this action.  "The

emails contained the agreement's material terms—indeed, its only terms. The judgment amount

was specified with particularity as was the counterclaim dismissal, and no other term was

ambiguous or left open for further negotiation." *Scheinmann*, 2017 WL 1422972, at *3; *cf.* *Velazquez*, 2017 WL 4404470, at *3 (finding that the third factor weighed against enforcement where the parties reached no agreement on whether Plaintiff would be paid in one lump sum or in a number of payments over months or years).

Elysium argues that many terms remained to be discussed including confidentiality provisions, enforcement provisions, choice of venue provisions, choice of law provisions, and what the interest rate would be. Dkt. No. 315 at 14–16. That argument is belied by the language of the parties. In accepting the offer, Elysium made clear that it would not accept any "conditions beyond the two" ChromaDex had described in its offer (i.e., those relating to the accrual/forgiveness of interest and the ability to recover fees in a collection act). Thus, once Elysium accepted those terms, it would not have been open to ChromaDex to refuse to consummate the settlement on the grounds, for example, that in addition to needing $2.5 million it would also need a confidentiality agreement, a choice of law provision, or a choice of venue provision.

None of the terms now mentioned by ChromaDex would have required further discussion between the parties; that is undoubtedly the reason why Elysium mentioned none of them either in its February 3 email or in the emails the following week reneging on the deal. The settlement offer conveyed in the February 2 Call contemplated a stipulated judgment containing the payment terms and a notice of dismissal. "[A] judgment would effectuate all the agreed-upon terms . . . ." *Scheinmann*, 2017 WL 1422972, at *3. As a matter of law, those documents are public and not confidential. *See Lugosh v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006) ("The common law right of public access to judicial documents is firmly rooted in our nation's history."). As to choice of law and choice of venue, with respect to the stipulated

16

judgment—which is the document that would have the settlement terms—there would be no

need for further agreement.[4]  The Federal Rules of Civil Procedure set forth the rules regarding

enforcement of a federal judgment.  Fed. R. Civ. P. 69; 12 Richard L. Marcus, Federal Practice

and Procedure (Wright & Miller) (3d ed. 2022) ("Execution normally issues from the court

rendering the judgment.").  Finally, interest rates for federal judgment are set by statute.  28

U.S.C. § 1961.

The final factor is whether the agreement at issue is the type of contract that is usually

committed to writing.[5]  It is not sufficient to address this factor for a party to state that settlement

agreements are typically written; "[s]ince the *Winston* test is designed to determine if a

settlement agreement is binding absent a formally executed agreement, it would be a strange test

---

[4] Elysium argues that the lack of choice of law and choice of venue provisions "is on full display in this motion," because absent contractual provisions to that effect, this Court does not have the power to enforce this settlement—which would resolve the action before it—because it also necessarily and inseverably implicates the California Action.  Such a principle of law is both without legal support in Elysium's briefing and untenable; it would mean that any settlement that resolves disputes spanning multiple jurisdictions and that lacks a forum selection clause is categorically unenforceable.  Moreover, any question as to whether New York law or California law applies is moot, because "the law regarding the formation of an enforceable agreement is the same in both jurisdictions," so "the outcome would be unchanged under California law."  *Prince of Peace Enterprises, Inc. v. Top Quality Food Market, LLC*, 760 F. Supp. 2d 384, 397 (S.D.N.Y. 2011).

[5] Elysium also argues that the Statute of Frauds requires a writing, as by its terms the agreement would not be fully paid within one year of the contract's alleged creation, *see Morgenweck v. Vision Capital Advisors, LLC*, 410 F. App'x 400, 402 (2d Cir. 2011) (summary order).  Such an argument is unavailing for two reasons.  First, although the settlement does not contemplate performance within a year, it does permit such performance.  *See Guilbert v. Gardner*, 480 F.3d 140, 151 (2d Cir. 2007).  Second, even if a writing were required, Elysium's February 3 email outlining and accepting the contract terms, satisfies the requirements of a writing for the Statute of Frauds.  *See, e.g.*, *Zhi Zhong Qiu v. Diamond*, 2020 WL 978352, at *3 (S.D.N.Y. Feb. 27, 2020) (outlining the requirements that "the writing must, on its face: (1) be subscribed to by the party charged; (2) designate the parties to the agreement; (3) identify and describe the subject matter; and (4) establish, either expressly or by reasonable implication, all the essential terms of the agreement" and noting that emails that satisfy these four requirements will satisfy the Statute of Frauds).

if the fourth factor always favored finding no agreement on the ground that settlement agreements usually are written." *Hostcentric*, 2005 WL 1377853, at *9.  Rather, "[c]ourts evaluate complexity by considering '(1) the amount of money at issue, (2) whether the terms of agreement will carry into perpetuity, and (3) the length and complexity of the agreement itself.'" *Grgurev*, 2016 WL 6652741, at *7 (quoting *Conway*, 236 F. Supp. 2d at 251).  "[T]his prong of the analysis focuses on 'whether the settlement terms are sufficiently complex or involve long time periods such that there should be a formal writing,' not on whether certain entities . . . prefer to put their settlement agreements in writing." *Estate of Andrea Brannon*, 2016 WL 1047078, at *3 (quoting *Case v. City of New York*, 2012 WL 5951296, at *7 (S.D.N.Y. Nov. 28, 2012)).

Elysium argues that the settlement would usually be committed to writing.  It argues that the Second Circuit held in *Winston* that a $62,500 settlement payment was not a "trifling amount" in concluding that the settlement there was of the type that generally required a written contract, whereas the settlement here was for $2.5 million.  Dkt. No. 316 at 16.  It also argues that the cases settled by written emails involve written offers and written acceptances and far less lucrative agreements than those at issue here, and that ChromaDex, a large publicly traded company, would not have used the February 3 email to settle the case. *Id.* at 16–17.  Those arguments, however, are unavailing.

As an initial matter, Elysium put its agreement to the terms conveyed by ChromaDex in writing.  It laid out in detail and with specificity each of the five material terms of the agreement as well as the documents that would need to be prepared to effectuate that agreement and stated that it would not accept any other terms or conditions.  At that point, the parties "were not dealing with an oral agreement" but rather one that had been accepted and confirmed in writing by Elysium. *Hostcentric*, 2005 WL 1377853, at *10.

Second, there is no rigid cutoff that settlements that exceed a million dollars must always be in the form of a document executed by both sides.  The magnitude of the settlement here was relatively small given the nature of the two commercial litigations it would resolve.  And there is no requirement that after an oral offer is accepted in a written acceptance, the offer need be reiterated or reconfirmed in writing.  A contract is formed at the moment there is an offer and acceptance; the offer need not be reiterated for a binding agreement to be formed and for both the offeror and the acceptor to be legally bound.  *See Kowalchuk v. Stroup*, 873 N.Y.S.2d 43, 47 (1st Dep't 2009) ("[T]he moment of acceptance is the moment the contract is created.").  "Once reached, a settlement agreement constitutes a contract that is binding and conclusive and the parties are bound to the terms of the contract even if a party has a change of heart between the time of the agreement to the terms of the settlement and the time it is reduced to writing." *Hostcentric*, 2005 WL 1377853, at *4 (internal quotation marks omitted and alteration adopted) (quoting *Macdonald v. Dragone Classic Motor Cars*, 2003 WL 22056626 at *6 (D. Conn. Apr. 29, 2003)).

Finally, ChromaDex was bound by the terms of its oral offer the moment it was accepted in writing by Elysium; Elysium cannot avoid its corresponding legal duties on the pretense that because it is a public company it would require not only a written acceptance but also a written offer.

To be sure, the settlement agreement could not be consummated without "documentation."  There would need to be a stipulated judgment in the California Action and a notice of dismissal in this action.  But those writings are not necessary to have a settlement. They are necessary only to effectuate it.

## CONCLUSION

The motion to enforce the settlement is GRANTED.

19

The Clerk of Court is respectfully directed to close Dkt. No. 303.  The parties are directed to file a notice of dismissal on the docket, in accordance with the settlement terms, by April 26, 2022.


SO ORDERED.

Dated: April 19, 2022
      New York, New York                                       LEWIS J. LIMAN
                                              United States District Judge